### In re ORPHEUM CIRCUIT, Inc.
### No. 56381.

District Court, S. D. New York.
June 11, 1937.

Isador J. Kresel and Riegelman, Hess & Hirsch, all of New York City, for petitioners.

Jules C. Randal, of Buffalo, N. Y., for Philip J. Snyder as trustee for Omaha-Orpheum bondholders.

O. C. Doering, Jr., of New York City, for Stadium Theatres Corp.

Beekman, Bogue, Leake, Stephens & Black, of New York City (Edward K. Hanlon and Douglas M. Black, both of New York City, of counsel), for trustee, in bankruptcy.

PATTERSON, District Judge.

The petitioners, holders of shares of preferred stock of the bankrupt corporation, bring up for review two orders by the referee in charge of the case. By one order the referee directed the trustee in bankruptcy to accept an offer made by Stadium Theatres Corporation to purchase substantially all the bankrupt's assets, and to reject a counter-offer sponsored by the preferred stockholders. By the other order the referee dismissed an application by the same preferred stockholders to compel the trustee in bankruptcy to file a petition for reorganization of the bankrupt as part of a reorganization proceeding of Radio-Keith-Orpheum Corporation now pending before one of the judges of this court.

The bankrupt was organized as a holding company in 1919. Its subsidiaries operated a number of vaudeville theatres in the West and Middle West. Its entire common stock was acquired in 1928 by Keith-Albee-Orpheum Corporation (KAO), and later in the same year the entire common stock of KAO was acquired by Radio-Keith-Orpheum Corporation (RKO). By 1929 the bankrupt had thus become a subsidiary of RKO, a company in the business of producing, distributing, and showing motion pictures. The bankrupt had outstanding some 63,000 shares of preferred stock, part of the shares owned by RKO and part owned at large.

As the depression deepened and heavy losses in operations ensued, the bankrupt began to borrow large sums of money from its immediate parent, KAO, with the result that by May 3, 1932, its borrowings from that source had reached the figure of $1,800,000. Pursuant to an agreement made on May 3, 1932, the bankrupt gave to KAO its note due March 31, 1933, to cover the advances theretofore made, and pledged almost its entire assets, consisting of stocks held by it in the theatre companies and claims against those companies, to secure that note as well as other notes for further advances agreed to be made by KAO to bring the total advances to $1,850,000. The further advances to the $1,850,000 mark were made later in May, 1932, against notes maturing on March 31, 1933. In the following months new cash loans were made by KAO, amounting to $980,000 by September 1, 1932. By an agreement of September 14, 1932, it was agreed that KAO would take a note due February 1, 1933, to cover these new loans, the note to be secured by a junior lien on the collateral already held to secure the notes given in May. The note was delivered and a formal indenture of lien was executed on October 22, 1932. In addition to the foregoing loans, KAO made a final advance of $50,000 on October 1, 1932, and took a note secured in the same way as the $980,000 note was secured.

In this manner the bankrupt had become indebted to KAO for a total principal amount of $2,880,000, and practically the entire assets had been pledged to secure the debt.

The bankrupt filed a voluntary petition in bankruptcy on January 27, 1933, and was adjudicated the same day. In due course KAO filed a claim for $3,000,000, representing the loans made and accrued interest to the date of bankruptcy. The claim was filed as a secured one. Some months later the KAO claim was assigned to the Stadium Company, another subsidiary of RKO, which took possession of the pledged securities and has managed them ever since. The claim next largest in amount was a claim for $1,112,000, filed by trustees for holders of bonds issued by one of the bankrupt's subsidiaries, Omaha Orpheum Company, the bonds bearing the bankrupt's guaranty. The claim filed in behalf of the Omaha bondholders was objected to by the trustee in bankruptcy but was held valid. This claim later passed to one Snyder, a successor trustee for the Omaha bondholders. The trustees for Omaha bondholders seem to have been the only creditors who played an active part in the bankruptcy proceeding. Altogether the claims filed against the bankrupt estate amounted to nearly $5,600,000. The assets consisted of the sum of $3,000 in cash and the bankrupt's equity of redemption in the stocks and claims pledged as collateral security to KAO. RKO had gone into equity receivership on the same day that Orpheum had gone into bankruptcy. The RKO proceeding in 1934 passed over into one for reorganization under section 77B, Bankr.Act (11 U.S.C. A. § 207).

The trustee in bankruptcy in 1934 gave notice that the validity of the pledges was not conceded. Nothing to test their validity was done for the time being. In 1935, however, the trustees for the Omaha bondholders as creditors of the bankrupt estate made demand that suit be commenced to set aside the pledges on the ground that they were voidable preferences under section 15 of the New York Stock Corporation Law (Consol.Laws, c. 59), and also that suit for waste be commenced against former directors of the bankrupt. Preferred stockholders made like demands. After vicissitudes, these demands resulted in an order of the referee of March 30, 1936, to the effect that the trustee in bankruptcy bring suit to set aside the pledges of the bankrupt's property, and that the preferred stockholders and the trustees for the Omaha bondholders might jointly bring suit against the former directors, such suit to be brought in the name of the trustee in bankruptcy. Friction developed between the preferred stockholders and the Omaha bondholders as to the conduct of the contemplated suit, with the result that nothing had been done by December, 1936. Matters then took a new turn because of an offer made by the Stadium Company to purchase the assets of the bankrupt estate.

By letter to the trustee in bankruptcy dated December 23, 1936, and by later amendment, the Stadium Company made an offer to buy all assets of the bankrupt estate (except cash in the trustee's possession not to exceed $2,500) for the sum of $700,000 in cash, the claims held by Stadium against the bankrupt estate and also the claims held by certain subsidiaries against the bankrupt estate, making up together claims of a principal amount of $3,450,000, to be canceled or subordinated to the claims held by other creditors. The making of the Stadium offer had been authorized by the judge in charge of the RKO proceeding. By the terms of this offer $700,000 in cash, less expenses of administration, would go as dividends to the holders of claims totalling $2,100,000. On application by the trustee in bankruptcy, the referee directed that a meeting of creditors be held, and on January 8, 1937, notice was sent to all creditors of a meeting set for January 25th, at which the offer to purchase the assets would be considered. The creditors' meeting was later adjourned to February 2, 1937. Appraisers appointed by the referee by order of January 8, 1937, appraised the cash, stocks, and claims owned by the bankrupt and held in pledge by Stadium at a present worth of $2,770,000. Of this amount cash amounted to $557,000.

At the creditors' meeting on February 2, 1937, the Stadium offer was read and considered. The preferred stockholders tendered an offer by a nominee, in which $2,000,000 in cash was offered for the assets "free and clear of liens." The offers were discussed. The referee asked the stockholders whether they would give assurance to the independent creditors that the dividends for them would come to $700,000 if the Stadium offer were rejected, but no assurance was forthcoming. The trustee for the Omaha bondholders,

with a claim of $1,112,000, the only creditor represented at the meeting other than the Stadium Company which did not vote, voted in favor of the Stadium offer. No creditor voted for the counter-offer. The preferred stockholders then presented an application, notice of which had already been given, in lieu of any contemplated sale of the assets. Their application, after reciting the history of the bankrupt and its relationship to KAO and RKO, dealt with a proposed plan of reorganization of RKO which had recently been filed in the RKO proceeding by holders of common stock of RKO, a copy of the plan being annexed to the application. The preferred stockholders alleged that in the balance sheet of RKO attached to the plan the net proceeds from operation and management of the Orpheum assets by the Stadium Company were shown to be $397,000 over a three and one-half year period from April 1, 1933; that in the plan it was proposed that creditors of RKO receive preferred stock and common stock said to be worth about $100 for each $100 in claims, and it was proposed further that common stockholders of RKO receive new common stock said to be worth about $16 for each share of old stock; that the proposed plan was based on assumed earning power of RKO and that of such earning power the earning power of Orpheum assets held in pledge by the Stadium Company made up a one-fourth or a one-third part. It was alleged also in the application, on information and belief, that the true earnings of the Orpheum assets were presently at the rate of $500,000 a year. It was charged that the proposed plan of reorganization, in combination with the pledge of the bankrupt's assets in 1932 and the present Stadium offer to purchase the assets, would constitute a fraud on the creditors and stockholders of the bankrupt Orpheum Company and would discriminate unfairly in favor of creditors and stockholders of RKO and against the creditors and stockholders of Orpheum. The relief prayed for was (1) that the Stadium offer be rejected, (2) that the trustee in bankruptcy be directed to file a petition in the RKO proceeding for reorganization of the bankrupt as part of the reorganization of RKO and be directed to oppose the proposed RKO plan as unfair and discriminatory, and (3) that the bankrupt be required to join in the trustee's petition in the RKO proceeding.

The referee on February 18, 1937, made an order directing the trustee in bankruptcy to accept the offer of the Stadium Company and to reject the offer tendered in behalf of the preferred stockholders. On the same day he made an order dismissing the application of the preferred stockholders with reference to intervention in the RKO reorganization. These are the orders brought up for review. From his certificate, it appears that the referee was of opinion that the Orpheum, having been adjudicated bankrupt, must be taken as insolvent for all purposes so long as the adjudication in bankruptcy stands, whatever its actual assets and liabilities; that the sole remedy of the preferred stockholders was to move for vacating of the adjudication, failing which they had no standing; that the Stadium offer was a better one for creditors than the offer tendered by the preferred stockholders, as well as being the only offer voted for by a creditor, that offer having been voted for by the independent creditor holding the largest claim.

The question is whether the referee's orders, on the proof before him, were correct. The entire bankruptcy proceeding having been committed to the charge of the referee, the power of this court is strictly one of review by an appellate judge. It has not the power to exercise an independent discretion in the matter. In re Realty Foundation, 75 F. (2d) 286 (C.C.A.2).

I do not share the referee's view that the adjudication in bankruptcy is conclusive proof of the insolvency of the bankrupt corporation, and that by the mere adjudication stockholders are barred from being heard in opposition to a sale of the assets and from seeking relief by recourse to the reorganization proceeding of the parent corporation. For one thing, the petition in bankruptcy was a voluntary one. Since a solvent debtor may file a voluntary petition, an adjudication on a voluntary petition does not carry a necessary inference of insolvency even at the time of adjudication. People's National Bank v. Foltz, 25 F.(2d) 295 (C.C.A.6). Again, the assets of a bankrupt estate may subsequently have risen in value. So it is possible that a debtor insolvent at the commencement of the bankruptcy proceeding may turn out to be solvent at a later time. The case cited by the referee, West

Company v. Lea, 174 U.S. 590, 19 S.Ct. 836, 43 L.Ed. 1098, has no bearing, and the statement in In re Witherbee, 202 F. 896 (C.C.A.1), to the effect that while an adjudication remains in force, the bankrupt must be regarded as insolvent for all purposes, whatever the value of assets or the amount of liabilities, is a generality that is to be read against the facts of that particular case. I take it that a bankrupt may under some circumstances block a sale of the assets of the bankrupt estate or may obtain appropriate relief by other measures where he makes a clear showing that the assets exceed the liabilities and that the proposed sale will result in an unnecessary sacrifice, and where he offers provision for prompt payment of creditors' claims; and I take it that minority stockholders of a bankrupt corporation may get like relief where a similar showing is made and the case is one in which a stockholders' bill would lie but for the bankruptcy. See Regal Cleaners & Dyers, Inc. v. Merlis, 274 F. 915, 917 (C.C.A.2).

But without a fair showing of actual solvency stockholders in a corporation whose assets are being wound up in bankruptcy have no interest in the bankrupt estate, no standing to oppose a sale of the assets at any price, good or bad. Creditors come first. They must be paid in full before stockholders get anything. The Bankruptcy Act by section 58 (as amended, 11 U.S.C.A. § 94) requires notice of proposed sales to be given to creditors; no notice need be sent to the bankrupt or to stockholders of a bankrupt company, and this because generally a bankrupt and stockholders have no interest to protect. So stockholders of a bankrupt company in opposing a sale of assets voted for by the creditors must allege and be prepared to prove at the very least that the bankrupt company is in reality solvent. A like showing must be made where stockholders of a bankrupt company seek to have the proceeding turned into one for reorganization in combination with the reorganization of a parent company, over the opposition of the bankrupt's creditors. If the bankrupt is insolvent, such a proceeding would be quite futile, not merely because the creditors oppose any such reorganization and can block it, but also because stockholders in an insolvent company may not get something for nothing by plan of reorganization. See Tennessee Pub. Co. v. American Nat. Bank, 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. 13; In re 620

Church Street Bldg. Corporation, 299 U. S. 24, 57 S.Ct. 88, 81 L.Ed. 16. The stockholders of a concern whose liabilities exceed the assets are no better off on the reorganization side than in bankruptcy on the liquidation side. Unless, therefore, there was an adequate showing before the referee that the assets were greater than the liabilities, both orders made by the referee and complained of by the stockholders were proper.

The proof before the referee did not indicate a present condition of solvency. The claims filed against the bankrupt totalled nearly $5,600,000 as of January, 1933, $3,450,000 held by the Stadium Company and allied concerns and $2,100,000 held by strangers. The validity of these claims has never been seriously questioned by the stockholders. With interest from adjudication down to the creditors' meeting (and interest must be paid before stockholders can get anything), the claims were $7,000,000. With liabilities presently at $7,000,000, what was there before the referee as to the present worth of the assets? The appraisers' report on the bankrupt's assets held in pledge by Stadium as of January 28, 1937, showed a value of $2,700,000, this figure including $557,000 in cash. The appraisal was by independent appraisers and covers the properties item by item. It is the most dependable proof in the record regarding value of assets. The stockholders offered almost nothing in the way of allegation or of proof as to the value of the pledged assets. The statement on information and belief that the assets were earning from $300,000 to $500,000 a year may hardly be deemed an allegation of value. If this alleged earning power rests on the figure of $397,000 cash appearing on the balance sheet attached to the proposed RKO plan, as it evidently does, it has insufficient foundation, there being nothing to show that the $397,000 represents earnings. The same is true of the $557,000 cash shown on the appraisers' report. It cannot be taken for granted that this amount was made up of earnings from the pledged assets. The report of the trustee's accountants covering the operations of the subsidiary companies down to November 21, 1936, showed no earnings approaching these figures. The only assets unpledged are $3,000 in cash and an alleged cause of action against former directors and officers for waste. The record does not reveal anything as to the amount of that

cause of action, the alleged facts on which it rests, or the likelihood of success. The petition submitted by the stockholders to the referee did not contain any allegation that the bankrupt was then solvent or any allegation that the assets were worth at the time more than the amount of the liabilities. The complaining stockholders offered to purchase all assets free and clear of liens for $2,000,000. If that figure can be taken as their estimate of value, the bankrupt estate has only $2,000,000 of assets against $7,000,000 of liabilities.

It was for the stockholders to prove a condition of solvency and such proof they did not tender. On the facts shown by the record the bankrupt was in a state of insolvency at the time of the referee's orders.

The trustee for the Omaha bondholders and the trustee in bankruptcy challenge the sufficiency of the stockholders' application on another ground. They maintain that the bankruptcy court has no power to order a trustee in bankruptcy or a bankrupt corporation to file a petition for reorganization of an estate in bankruptcy. The soundness of this argument need not be considered, since the application was properly dismissed on another ground.

The referee did not err in rejecting the counter-offer tendered by the stockholders. That offer, in requiring that all the assets be transferred and delivered free and clear of liens, ignored the stubborn facts of the situation. Since most of the assets were in possession of an adverse claimant under claim of pledge that was more than merely colorable, the bankruptcy court had no power to sell the assets free and clear of liens. Even if the assets could have been sold free and clear of liens and the liens transferred to the proceeds of sale, the Stadium offer may well have been a better one for independent creditors, as the referee pointed out. It eliminated the question of the validity of the pledges and gave them a dividend of 33 per cent. subject to administration expenses. Under the counteroffer, they would get nothing in case the pledges were found to be valid after litigation between the trustee in bankruptcy and the Stadium Company. The referee suggested that the objecting stockholders give some assurance to the independent creditors that on rejection of the Stadium offer they would receive as much as $700,-000 by way of dividends, and he intimated that he would withhold decision to enable the objecting stockholders to tender such assurance; but no assurance was given.

In its final phase this case settled down to a struggle between a trustee representing bondholders and a committee representing preferred stockholders. There is no reason to believe that the trustee for bondholders in pressing for a sale was actuated by any motive other than a proper desire to get the best dividend possible for the bondholders behind him. There being nothing to indicate that the bankrupt was in a solvent condition, the referee did not err in giving decisive weight to the interests and demands of creditors. No creditor has filed petition to review his orders. On the petitions to review filed by stockholders the orders of the referee will be affirmed.